## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CHLOE A. DAVIS, | : | |
| Plaintiff | : | |
| v. | : | C.A. No. 21- |
| | : | |
| CITY OF PROVIDENCE, by and | : | **Jury Trial Demanded** |
| through its Treasurer, James J. | : | |
| Lombardi, III, OFFICER NATHANIEL | : | |
| COLICCI alias, OFFICER VIERIA, alias,: | | |
| individually and in their official | : | |
| capacities as police officers in the | : | |
| City of Providence Police Department, | : | |
| and HUGH T. CLEMENTS, JR., alias, | : | |
| individually and in his official capacity as | : | |
| Chief of the City of Providence Police | : | |
| Department,  and STEVEN M. PARÉ, | : | |
| alias, individually and in his official | : | |
| capacity as Commissioner of Public | : | |
| Safety for the City of Providence, | : | |
| Defendants | : | |

## COMPLAINT

### I.     Introductory Statement

This action is brought by the Plaintiff seeking declaratory and injunctive relief and compensatory and punitive damages for acts and/or omissions of Defendants in violation of Plaintiff's rights to freedom of speech, unreasonable search and seizure, and malicious prosecution under the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, §§2, 6, and 21 of the Rhode Island Constitution, and under the laws of the State of Rhode Island.

### II.     Parties

1.     Plaintiff Chloe A. Davis is a resident of the City of Cranston, County of Providence, and State of Rhode Island.

2.     Defendant City of Providence ("City") is a duly authorized and organized municipality under the laws of the State of Rhode Island and is sued by and through its Treasurer,

James J. Lombardi, III, alias, the official designated by state law, R.I. Gen. Laws § 45-15-5, to be named in a suit for relief against the City.

3.     Defendant Officer Nathaniel Colicci, alias, is sued individually and in his official capacity as a police officer in the City Police Department.

4.     Defendant Officer Vieria, alias, is sued individually and in his official capacity as a police officer in the City Police Department.

5.     Defendant Hugh T. Clements, Jr., alias, is sued individually and in his official capacity as Chief of the City Police Department.

6.     Defendant Steven M. Paré is sued individually and in his official capacity as Commissioner of Public Safety for the City.

### III.     Jurisdiction

7.     This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1367, 2201 and 2202.

### IV.     Venue

8.     Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in the District of Rhode Island.

### V.     Material Facts

#### A.  Background Facts

9.     Plaintiff is and was at all relevant times a licensed and practicing attorney in Rhode Island.

10.     Over the spring and summer preceding the events at issue in this Complaint, the United States in general, including Providence, Rhode Island, was the scene of massive protests opposing police brutality, violence, racism, lack of accountability, and abuse of power.

11.     Police across the United States, as well as police in Providence, responded to these protests by using violent and aggressive tactics against protestors, including the use of chemical weapons, physical violence, and baseless arrests.

12.     Attorneys and other legal workers volunteered throughout these protests as third-party legal observers, whose primary role was to observe law enforcement actions including documenting arrests, use of force, intimidating displays of force, denial of access to public spaces like parks and sidewalks, and any other behavior on the part of law enforcement that appears to restrict demonstrators' ability to express their political views through their constitutionally protected right to free expression.

13.     These legal observers were trained by various legal organizations, including the National Lawyers Guild and the American Civil Liberties Union.

14.     Plaintiff Davis was trained through the National Lawyers Guild.

15.     Legal observers also gather evidence, take witness statements, and connect those who are arrested with legal representation.

16.     Legal observers attend protests only when asked to do so and are not active participants in demonstrations.

17.     People working as legal observers wear distinctive attire.

18.     Those trained by the National Lawyers Guild and observing under their auspices, such as Plaintiff Davis, can most often be identified by their well-known and distinctive neon green hats that read "National Lawyers Guild Legal Observer" or "NLG Legal Observer."

**B.  Chronology of Events**

19.     On or about October 21, 2020, Plaintiff was asked to be a legal observer for a protest planned to start later that same day beginning at Sackett Street Park in Providence, at 8 p.m.

20.     The protest was in response to a Providence Police Officer chasing Jhamal Gonsalves ("Mr. Gonsalves") in a vehicle in an aggressive and intentionally dangerous manner, which resulted in Mr. Gonsalves suffering severe injuries, including putting him into a coma for approximately two months.

21.     Activists also planned to protest violent tactics and baseless arrests made against protesters the day before who had also been protesting the Providence Police conduct and the resulting injuries sustained by Mr. Gonsalves days earlier.

22.     Plaintiff agreed to be one of the legal observers for the protest, along with another attorney, Anna Kastner ("Ms. Kastner").

23.     Plaintiff arrived shortly before 8 p.m., met her fellow legal observer Ms. Kastner, and waited for the protest to begin.

24.     Plaintiff was wearing the above-described bright neon green hat that designated her as a legal observer.

25.     Protesters began to march between about 8:30 p.m. and 8:45 p.m., beginning the march by heading north on Broad Street.

26.     At this point Plaintiff estimates there were between fifty (50) and one hundred (100) protesters present.

27.     The protesters were marching in the street, as had been the norm during numerous protests throughout the summer and fall with the acquiescence of the police who allowed protesters to march in the streets, blocking traffic in both directions, without taking any action or asking protesters to change their behavior.

28.     However, unlike many other marches during this period, where protestors marched in both directions and thereby blocked the roads, during this march the protesters only blocked one lane of traffic, allowing cars to go around the protesters and pass easily.

29.     Plaintiff followed behind the demonstrators observing their actions and those of the police.

30.     At or about 9 p.m., the protesters reached the police station at the corner of Broad Street and Moore and chanted for several minutes without incident.

31.     During this stationary period, the protesters also did not completely block traffic, continuing to allow vehicular traffic to pass in one lane.

32.     Protesters then continued to march, heading north to Whitemarsh Street, turning left, and meandering through side streets until they reached Elmwood Avenue, turned left, and headed south on that street.

33.     Protesters continued to march for at least another hour, staying to the right side of the street and allowing traffic to pass.

34.     As the protesters were marching, cars began to join the protest, following behind the marching protesters, honking and playing music, with at least ten (10) cars ultimately joining the protest.

35.     During this period, up until about 10 p.m., there were no incidents, and everyone was acting peacefully.

36.     Around 10 p.m., as the march approached Park Avenue, just south of where Elmwood Avenue merges with U.S. Route 1, police officers from the City of Cranston Police Department had barricaded the road with officers and police cars.

37.     These police were preventing all traffic from passing, including protesters and ordinary traffic in both directions, causing confusion as both protesters and non-participating

drivers and pedestrians could not move freely, did not know what to do, and depending on how far from the blockade could not even tell what was going on.

38.     This traffic issue was caused entirely and exclusively by the Cranston Police blockade.

39.     At this point, Plaintiff began trying to take photographs of the license plates of the police cruisers that were parked in the middle of the street.

40.     Plaintiff had been trained to take such photographs as part of her legal observer training, had done so on numerous occasions while legal observing during protests, and had always done so without problems.

41.     Plaintiff walked to the left side of the blockade and took photographs without incident, but when she walked to the right side to take photographs a police officer been screaming at her, yelling "get the fuck away."

42.     Plaintiff backed away and tried to take photographs from farther away but another officer began shinning a flood light in her face so she could not get clear photographs.

43.     Plaintiff had never before encountered police attempting to prevent her from documenting them during protests in any of the other protests Plaintiff had legal observed nor had she heard of such behavior from other local legal observers.

44.     At this point, the situation became more hectic, and Plaintiff had difficulty observing all the police activity because protesters and police officers were all running, yelling, and engaging with each other.

45.     During this period, Plaintiff saw a police officer run up to a car that was stopped and spray the female driver in the face from inches away with a large amount of pepper spray through her open window.

46.     Plaintiff was shocked by how violent, dangerous, unprovoked, and unnecessary this action was, particularly when the only action taken by the woman was to shout at police officers.

47.     The woman was behind the wheel of a car, the engine was on, and she could easily have inadvertently injured people if she had lost control of the car and driven forward while being pepper sprayed.

48.     By this point, the march had largely broken up, most people were standing on the sidewalks, and people were generally just trying to stay safe as police were attacking and pepper spraying people without provocation or warning.

49.     Some people were talking amongst themselves while others were still chanting and yelling.

50.     There was still a lot of activity, however, and several officers were chasing and attacking people while medics and protesters were trying to provide aid to the many pepper-sprayed people.

51.     Many protesters had disbursed at this point but police officers, from Providence, Cranston, and the Rhode Island State Police, continued to arrive.

52.     As more and more people disbursed and more police arrived, the police presence became completely overwhelming, outnumbering the remaining protesters and bystanders.

53.     The police, who at this point numbered at least fifty (50) and were equipped with riot gear and large batons, formed a line across the width of the street, two or three police officers deep, facing the few remaining protesters who were mostly standing around on the sidewalks, doing nothing.

54.     A higher-ranking officer, believed to be Defendant Viera, was commanding this force of police.

55.     The police were explicitly ordered to spread out and cover the sidewalks as well as the street.

56.     The police began marching forward in formation.

57.     Shortly after, the police began yelling in unison, "Move back."

58.     Plaintiff stayed in the area, off to the side and on the sidewalk, moving back when ordered, and continued observing.

59.     Plaintiff was concerned that this was the period of the protest that was most likely to result in arrests based on the aggressiveness of the police and their large number compared to the small numbers of protesters left.

60.     It was essential that Plaintiff stay and observe at this point because her purpose as a legal observer is to observe and document interactions between the police and protestors, particularly arrests.

61.     At no point was Plaintiff in the street or doing anything other than discharging her duties as a legal observer peacefully and in an orderly fashion.

62.     Plaintiff hoped that the police would move slowly and stop often giving the protesters time to disperse as was already happening, something she had observed the Providence Police do on other occasions.

63.     However, after marching forward and then stopping a few times, the police, without warning or provocation, suddenly charged at full speed toward the few remaining protesters on the street, as well as anyone on the sidewalk, including Plaintiff, and random bystanders who happened to be in the area.

64.     This order—for a number of police to run at and arrest protesters without warning after they had continually moved when told and also to target and arrest individuals peacefully

standing on the sidewalks—was given by a higher-ranking officer on scene, believed to be Defendant Vieira.

65.     Plaintiff was extremely scared by this and began to run down the sidewalk away from the charging police.

66.     Plaintiff was wearing sandals and is not a fast runner and the police caught up with her quickly.

67.     Defendant Colicci ran up onto the sidewalk, and without saying anything to Plaintiff, grabbed her from behind and threw her to the ground.

68.     Defendant Colicci placed his knee on Plaintiff back and pushed heavily on her back, while jamming her face into the sidewalk, making it very hard for her to breathe while other officers towered around her, and she struggled to shout, "I can't breathe."

69.     Defendant Colicci eventually eased the weight from his knee on Plaintiff's back slightly so he could begin forcing plastic zip-tie handcuffs on her.

70.     When Defendant Colicci jerked Plaintiff's arms and hands to place the cuffs on her, she lost her grip on her phone, which she had been holding and which fell to the ground.

71.     As soon as Plaintiff could breathe, she tried to explain that she was a legal observer, saying it at least twice while she was cuffed and then jerked to her feet.

72.     Plaintiff also heard a bystander shouting at the officer arresting Plaintiff that she was a legal observer.

73.     When Defendant Colicci and the other police jerked Plaintiff to her feet, her glasses fell off her face and to the ground.

74.     Plaintiff found this immensely terrifying because she has terrible vision and cannot see clearly more than a few inches from her face without corrective lenses.

75.     Plaintiff instantly began yelling that she needed her glasses and that she could not see and was extremely panicked.

76.     The officer that was walking Plaintiff toward the prisoner transport van, who Plaintiff believes was not the arresting officer, responded to her pleas only with "You shouldn't have been here," which he said over and over.

77.     When Plaintiff reached the prisoner van, a police officer pulled her purse off her body, which was fastened around her waist.

78.     A police officer removed Plaintiff's Rhode Island driver's license and asked her to confirm her identity, which she did.

79.     Another officer said he would go look for Plaintiff's phone and left, coming back a minute later saying he had her phone, placing it in Plaintiff's purse, which was still being held by another officer.

80.     Plaintiff thanked him for bringing her phone and begged him to find and bring her glasses as well.

81.     Plaintiff is unsure if he or any other police officer went to look, but her glasses were never returned to her.

82.     At this point, Plaintiff was ordered to climb into the then empty prisoner van, which she did.

83.     A police officer then tossed her purse into the van on the floor in front of her.

84.     After a short while another arrestee climbed in and sat down, telling Plaintiff that her name was August and she was at the protest as a medic.

85.     Plaintiff told August that she was a legal observer.

86.     The next arrestee to climb in was a young black man who kept saying he had no idea why he was arrested.

87.     He said he had just walked over when he saw a ton of flashing police lights and wanted to see what was going on.

88.     He said he saw the police running towards him and he did not even bother to run away, he just pressed himself against the building behind him to let the police run past him, but that they grabbed him and arrested him, and no one would tell him why.

89.     Eventually the police put six (6) arrestees in this van.

90.     All the arrestees were wearing masks for COVID-19 safety and it was extremely claustrophobic in the van.

91.     Some of the arrestees shouted to ask the police to open the door or a window to let air flow in but the police did not respond.

92.     The police eventually drove Plaintiff and the other arrestees to the Providence Public Safety Complex.

93.     Plaintiff and August, the only women arrested, were taken upstairs together and told to sit, still handcuffed, in semi-open cement rooms.

94.     Eventually a police officer came and uncuffed Plaintiff.

95.     A higher-ranking police officer, denoted by his white shirt, believed to be Defendant Vieria, kept walking past Plaintiff and telling the officers in the area that any officer who had been involved in an arrest needed to meet with him downstairs where they would all write one police report together.

96.     August was taken away to be processed while Plaintiff remained waiting.

97.     At about midnight, after August was taken to a cell, a police officer took Plaintiff to a woman at a desk for initial processing.

98.     Plaintiff was allowed to make two brief phone calls, one to the National Lawyers Guild hotline for arrestees and one to her husband, leaving messages for both.

99.     Plaintiff was then told she could only wear one shirt in the cell and had to choose one of her two thin tank-tops or her cardigan and surrender the others.

100.    Plaintiff was shocked and troubled by this and said so to the woman who replied that an imprisoned woman had once killed herself with a shirt and now arrestees were only allowed one shirt in a cell.

101.    Plaintiff was appalled by this explanation, thinking how terrible it was that the police responded to someone killing themselves in their custody by making that custody even more humiliating, unpleasant, and uncomfortable without any likelihood of preventing future suicides by the same method.

102.    Plaintiff, shocked and horrified, was pressed to choose and chose her cardigan.

103.    Plaintiff was placed in a cell and told that if she needed anything she should knock on the door and someone would respond.

104.    The freezing cold cell Plaintiff was placed in had only a metal bench, a metal toilet and sink, a small roll of toilet paper, and two cereal bars.

105.    Eventually, a number of police officers came to take Plaintiff out of her cell for more processing.

106.    When Plaintiff walked out of the cell, surrounded by three or more police officers one of the officers, a tall man, aggressively yelled, "Take your mask off!"

107.    Plaintiff asked why and was told, "Because I said so!"

108.    Plaintiff removed her mask and noted that all of the police officers were unmasked as well, which made Plaintiff very nervous due to the on-going COVID-19 pandemic, in particular the very high infection rate in Rhode Island at this time which was also before vaccines were available.

109.    Other than a brief moment when Plaintiff had her picture taken, there was no reason to force her to remove her mask during the processing.

110.    Plaintiff was finger-printed, had her picture taken, and was placed back in the same cell.

111.    Shortly later Plaintiff heard the same tall officer order August to take off her mask.

112.    When August replied, "Maybe you should put a mask on," the tall police officer screamed, "Shut the fuck up!"

113.    Plaintiff later heard August return to her cell.

114.    Plaintiff attempted to sleep or at least rest but could not as the cell was freezing cold, the bench even colder and hard, and the lights never went out.

115.    Finally, after a painful and sleepless night, Plaintiff was taken to the Rhode Island Sixth Division District Court in Providence.

116.    Plaintiff was arraigned and released on her personal recognizance shortly before noon.

117.    After telling a friend she had lost her glasses and could not drive or work without them, a friend went to search for them.

118.    While they eventually found them, they were irreparably crushed.

119.    Plaintiff had to call numerous eye doctors and wait over a week for replacement glasses, rendering her unable to drive or work properly for a week.

120.    Plaintiff was charged with disorderly conduct under R.I. Gen. Laws § 11-45-1(a) and given a court date for a pre-trial conference on December 9, 2020.

121.    Plaintiff retained private counsel, attorney Allyson Quay ("Attorney Quay"), to represent her.

122.    Attorney Quay reached out to the Defendant City's Law Department before the pre-trial conference seeking a dismissal of the case as Plaintiff was not engaged in any illegal activity and was present solely as a legal observer.

123.    Sara Pierson ("Attorney Pierson"), an attorney with the Defendant City's Law Department, initially offered Plaintiff a dismissal in exchange for community service on December 9, 2020.

124.    Plaintiff refused this offer on the same day, citing her total innocence and the illegal behavior of the Defendant City Police.

125.    Due to rising COVID-19 cases the Court informed Plaintiff's counsel that her pre-trial conference would be rescheduled to January 20, 2021.

126.    Plaintiff's attorney suggested to the Court that she could file a motion to dismiss and that the Court entertain the same on the papers without hearing to resolve the matter more quickly, despite COVID-19 related delays, and that a trial date as quickly as possible would be preferable.

127.    A trial date was set by the Court for February 4, 2021.

128.    On January 8, 2021, Defendant City eventually shared body-cam footage with Plaintiff's attorney, clearly showing Plaintiff on the sidewalk, in a legal observe hat, fleeing charging police and being thrown violently to the ground and kneeled on.

129.    Attorney Quay after watching said footage communicated her increased resolve to press forward with a motion to dismiss immediately.

130.    That same day, Attorney Pierson finally watched the body-cam footage of Ms. Davis's arrest; after confirming that this footage did indeed show Plaintiff's arrest, Attorney Pierson dismissed the case against Plaintiff without any conditions.

### C.  Municipal Liability

131.    At least two Police Officers in the employ of Defendant City, Defendants Colicci and Vieira were unaware of the Plaintiff's constitutional right to assemble and move freely about on public sidewalks and other public forums.

132.    On information and belief, this lack of awareness is widespread among Defendant City police officers.

133.    Upon information and belief, based on a Police Academy Curriculum used by Defendant City and sworn testimony, of eight hundred plus (800+) hours of Academy training, only three (3) to thirteen (13) hours are spent on training in anything remotely relevant to understanding, respecting, and protecting the civil and constitutional rights of citizens, and such training is the only constitutional and civil rights training officers receive before or during their employment with Defendant City's Police Department.

134.    This lack of knowledge on the part of officers has continued despite a series of recent lawsuits in which the Defendant City has been sued for the same or similar Fourth Amendment and free speech violations. *See e.g. Reilly v. Providence*, No. CA 10-461 S, 2013 WL 1193352 (D.R.I. Mar. 22, 2013); *Prince v. Providence*, C.A. No. 15-378M (D.R.I); *Kurland and Gould v. Providence*, C.A. No. 14-0524-WES-PAS (D.R.I); *Pombo v. Providence*, C.A. No. 1:15-cv-00291-ML-LDA (D.R.I); *Kurland v. Providence*, C.A. No. 18-cv-00440-MSM-LDA, two of which resulted not only in settlements but a consent decree or stipulation outlining proper constitution limits to policing of protesters.

135.    Per the sworn testimony of Defendant City police officers, Defendant City, Defendant Clements, and Defendant Paré have taken no action to properly supervise and/or notify, educate, and/or train City police officers relative to the rights of citizens to peaceably exercise First

Amendment rights in public forums such as streets, sidewalks, and parks without law enforcement or other governmental interference.

136.   Indeed, per the sworn testimony of Defendant City police officers, Defendants City, Clements, and Paré generally provide no information about the filing of suits against Defendant City police officers and Defendant City police department either when the cases are filed or when they are resolved, even in the case of resolution via a court sanctioned consent decree imposing prospective obligations on the Defendant City police department.

137.   Per the sworn testimony of Defendant City police officers, Defendants City, Clements, and Paré certainly took no action and provided no direction or training to prevent repeats of this unlawful behavior on the part of Defendant City.

138.   Indeed, per the sworn testimony of Defendant City police officers, Defendants City, Clements, and Paré, it seems that no officer has even been disciplined, retrained, or ever spoken to about these issues and at least some officers have been promoted.

139.   Defendant Clements has, in sworn testimony, endorsed the unlawful behavior of Defendant City police officers interfering with the peaceable exercise of First Amendment rights in public forums such as streets, sidewalks and indicated that he believes they should continue to act in this unlawful manner.

140.   Defendants Clements has also indicated in sworn testimony that he and Defendant Paré are the chief policy making officials for Defendant City's Police Department.

141.   Defendant City failed to properly select, train, instruct, supervise and/or discipline officers in the City Police Department, including Defendants Colicci and Vieira, relative to the constitutionally protected right of people to peaceably assemble and/or exercise other Fourth and/or First Amendment rights on public sidewalks and in other public forums.

142.     As is apparent by the disturbing regularity of such events, a custom or policy exists in the City Police Department wherein the Defendant City has acquiesced to, permitted, condoned and/or encouraged the deprivation of the constitutionally protected right of people to peaceably assemble and/or exercise other Fourth and/or First Amendment rights on public sidewalks and in other public forums.

143.     The Defendants knew or should have known that arresting Plaintiff Davis, and otherwise interfering with the Plaintiff's peaceful assembly on a public sidewalk, particularly where there was no obstruction of the sidewalk, was unlawful under the circumstances based on well settled law.

144.     Despite such knowledge, the Defendants, by and through their policy-making officials and agents, approved, acquiesced to, condoned, intentionally ignored, or were deliberately indifferent to such practice, and failed to change or eliminate such unlawful custom or policy.

### D.     Intentional Conduct

145.     At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with reckless or callous indifference to Plaintiff's clearly established constitutional rights.

146.     Furthermore, at all relevant times, Defendants knew or should have known that their conduct would cause or contribute to the deprivation of Plaintiff's clearly established constitutional rights.

147.     At all relevant times, Defendants were motivated by malice, wantonness and/or willfulness of an extreme nature.

### E.     Irreparable Harm and Damages

148.     The Defendants' actions have placed Plaintiff in the position of either refraining from constitutionally protected conduct or facing arrest and criminal prosecution.

149.     Indeed, Defendant City Officers attacked and arrested Plaintiff for merely observing their conduct and attempting to safeguard the constitutional rights of others as part of her role as a legal observer and officer of the Court.

150.     As a direct and proximate result of the Defendants' acts and/or omissions, including, but not limited to, those described herein, the Plaintiff has suffered and will continue to suffer deprivation of her right to freedom of expression under the First Amendment, and has thereby sustained and will continue to sustain irreparable harm.

151.     As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, the Plaintiff has suffered and will continue to suffer mental anguish, pain and suffering, impairment of her freedom of expression rights, deprivation of her civil rights, expenses for legal services, and other great damage.

### VI.     Claims for Relief

152.     Plaintiff incorporates in the counts below the allegations contained in ¶¶1 through 151 above.

### Count One
### *Impairment of Freedom of Assembly and Speech in Violation of the First and Fourteenth Amendments, Actionable Pursuant to 42 U.S.C. § 1983*

153.     Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and/or placed unlawful restrictions on her freedom of expression in violation of Plaintiff's right to assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

**Count Two**
***Impairment of Freedom of Assembly and Speech in Violation of Article 1, § 21 of the Rhode Island Constitution***

154.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and/or placed unlawful restrictions on her freedom of expression in violation of Plaintiff's right to assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 21 of the Rhode Island Constitution, actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

**Count Three**
***Violation of Right to Freedom from Unreasonable Search and Seizure in Violation of the Fourth and Fourteenth Amendments, Actionable Pursuant to 42 U.S.C. § 1983***

155.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

**Count Four**
***Violation of Right to Freedom from Unreasonable Search and Seizure in Violation of Article 1, §6 of the Rhode Island Constitution***

156.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free  from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 6 of the Rhode Island Constitution, actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

**Count Five**
***Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments,
Actionable through 42 U.S.C. § 1983***

157.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff without probable cause and with malice, which were terminated in favor of the Plaintiff, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

**Count Six**
***Malicious Prosecution in Violation of Article 1, §§ 2, 6 and 7 of the Rhode Island Constitution***

158.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff, without probable cause and with malice, which were terminated in favor of the Plaintiff, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of her rights secured under Article 1, §§ 2, and 6 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

**Count Seven**
***Common Law Malicious Prosecution***

159.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff without probable cause and with malice, which were terminated in favor of the Plaintiff, in violation of the common law of the State of Rhode Island, causing Plaintiff to suffer harm as aforesaid.

**Count Eight**
*Common Law False Arrest and False Imprisonment*

160.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, intentionally imposed by force and/or threats an unlawful restraint on Plaintiff, arresting her without probable cause and restraining her freedom of movement and restricting her liberty, including handcuffing her, locking her in a police van, and holding her in a detention cell, all without legal reason or justification, while Plaintiff was at all times conscious of her confinement, in violation of the common law, causing Plaintiff to suffer harm as aforesaid.

## VII.    Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.    A preliminary and permanent injunction restraining and enjoining Defendants from interfering with the exercise of the Plaintiff's right to observe law enforcement activities and/or exercise other First Amendment rights on public sidewalks and in other public fora guaranteed by the First and Fourteenth Amendments to the United States Constitution and Article 1, § 21 of the Rhode Island Constitution.

2.    Preliminary and permanent injunctions directing the Defendant City to properly select, train, instruct, supervise and/or discipline officers in the City Police Department relative to the constitutionally protected right of people to observe and record police behavior, to peaceably assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora in the City.

3.    Preliminary and permanent injunctions directing the Defendant City to properly select, train, instruct, supervise and/or discipline officers in the City Police Department relative to the constitutionally protected right of people to move about peaceably and freely on public sidewalks and in other public fora in the City.

4.     Preliminary and permanent injunctions requiring Defendants to seal and destroy the records derived from Plaintiff's unlawful arrest, including all photographs, fingerprints and other identification or descriptive information.

5.     A declaratory judgment that the Defendants, in the manner described herein violated the First and Fourteenth Amendments to the United States Constitution and Article 1, § 21 of the Rhode Island Constitution by impairing Plaintiff's rights to freedom of assembly and speech.

6.     A declaratory judgment that the Defendants, in the manner described herein, violated the First and Fourteenth Amendments to the United States Constitution and Article 1, § 6 of the Rhode Island Constitution by violating Plaintiff Davis's right to be free from unreasonable search and seizure.

7.     A declaratory judgment that the Defendants, in the manner described herein, violated Plaintiff's right to be free from malicious prosecution under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, §§ 2 and 6 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989), and under the laws of the State of Rhode Island.

8.     An award of compensatory damages.

9.     An award of punitive damages.

10.    An award of reasonable attorney's fees and costs of litigation to Plaintiff pursuant to 42 U.S.C. §1988.

11.    Such other and further relief as this Court deems just and proper

## VIII. <u>Demand for Jury Trial</u>

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.    <u>Designation of Trial Counsel</u>

Plaintiff hereby designates Richard A. Sinapi, Esquire, as trial counsel.

Plaintiff,
By her attorneys,

**Date:  December 13, 2021**

<u>**/s/ Richard A. Sinapi**</u>
**Richard A. Sinapi, Esq**. (#2977)
**Sarah E. Smalley, Esq.** (#9289)
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690; Fax (401) 739-9040
ras@sinapilaw.com; ses@sinapilaw.com